*531 MEMORANDUM **
Angela Cummings worked as a telemetry monitor technician at Valley Health System, LLC dba Desert Springs Hospital (“DSH”) from 2005 until 2013. Throughout her tenure at DSH, Cummings had a hostile relationship with one of her co-workers, Raejohne Foster.
In May 2012 and June 2012, Cummings complained to DSH that Foster was harassing her in the workplace; DSH investigated but did not find sufficient evidence to take action. In July 2012, Cummings filed charges with the Nevada Equal Rights Commission and the Equal Employment Opportunity Commission, complaining of race and gender discrimination. On December 18, 2012, Cummings met with DSH’s new Human Resources Director to complain about discrimination. On December 21, 2012, DSH issued three corrective actions against Cummings for several infractions she had committed' in the prior month. These three corrective actions, combined with two issued earlier in the year, placed Cummings one violation away from termination under DSH’s progressive discipline policy.
The final violation occurred on January 11, 2013, when DSH suspended Cummings pending an investigation into charges that she had been watching a video on the computer instead of monitoring the telemetry unit. On January 12, 2013, the DSH security office received a report from an employee named “Diane” in the telemetry unit, who stated that she had heard from “several employees” that Cummings threatened to “shoot up the place” if she were terminated. Donna Adkins, a DSH supervisor, responded to this report by informing DSH employees that the security code to the door would be changed as a precaution against Cummings’ purported threat. Adkins then initiated an investigation and determined that the reported threat was nothing more than a false rumor, but she could not identify the source of the rumor. Another DSH employee, Synthia Armstrong, checked the shift schedule for the telemetry unit on January 12, 2013, and determined that Foster was the other technician working with Diane that day.
On January 30, 2013, DSH held a meeting with Cummings to discuss her future with the company, but Cummings stormed out of the meeting before a resolution could be reached. DSH terminated Cummings’ employment effective February 20, 2013. Cummings filed suit against DSH, alleging defamation, retaliation, and discharge in violation of public policy. She also sued Foster, alleging defamation and intentional interference with prospective economic advantage. The district court granted summary judgment in favor of DSH and Foster on all claims. We review the district court’s grant of summary judgment de novo, Entrepreneur Media, Inc. v. Smith, 279 F.3d 1135, 1139-40 (9th Cir. 2002). We affirm in part, reverse in part, and remand.
1. Cummings’ defamation claim against DSH fails because Adkins’ statement to DSH employees about Cummings’ alleged threat was privileged. The intra-corporate communication privilege applies to a statement involving “the regular course of the corporation’s business,” if the statement is made in good faith to a person with an interest in the subject matter of the statement. Simpson v. Mars, Inc., 113 Nev. 188, 929 P.2d 966, 968 (1997). Here, Adkins received a genuine report *532 about Cummings’ threat from the DSH security office, and she took precautions to protect DSH employees by informing them about the threat. No reasonable jury could find that Adkins lacked a good-faith belief in the statement or acted with malice.
2. Cummings alleges that DSH retaliated against her in violation of Title VII, 42 U.S.C. § 1981, and Nevada Revised Statutes § 613.330. Each of these statutes is analyzed using the McDonnell Douglas framework. See Dawson v. Entek Int’l, 630 F.3d 928, 936 (9th Cir. 2011) (Title VII retaliation claims are subject to the McDonnell Douglas framework); Surrell v. Cal. Water Serv. Co., 518 F.3d 1097, 1104 (9th Cir. 2008) (Section 1981 claims are subject to the same standard as Title VII claims); Apeceche v. White Pine Cty., 96 Nev. 723, 615 P.2d 975, 977 (1980) (Nev. Rev. Stat. § 613.330 claims are subject to the same standard as Title VII).
Even assuming that Cummings has established a prima facie case of retaliation at step one of the McDonnell Douglas analysis, DSH has met its burden at step two of the McDonnell Douglas framework by articulating a legitimate, non-retaliatory reason for terminating Cummings' employment. DSH fired Cummings in accordance with its progressive discipline policy after she had accrued six corrective actions. See Unt v. Aerospace Corp., 765 F.2d 1440, 1446 (9th Cir. 1985) (“An employee is not protected by Title VII when he violates legitimate company rules, knowingly disobeys company orders, disrupts the work environment of his employer, or willfully interferes with the attainment of the employer’s goals.”).
Cummings has not shown pretext, as required at step three of the McDonnell Douglas analysis. Despite the close temporal proximity between Cummings’ discrimination complaint to DSH on December 18, 2012, and the three corrective actions DSH issued on December 21, 2012, the surrounding circumstances do not show pretext. See Coszalter v. City of Salem, 320 F.3d 968, 978 (9th Cir. 2003) (“[Tjhere is no set time within which acts necessarily support an inference of retaliation.... [Retaliation] must be decided in the light of the timing and the surrounding circumstances.”). First, each of the corrective actions that DSH issued to Cummings was based on an established company policy or practice. Next, DSH was responsive to Cummings’ complaints of harassment and provided Cummings with a summary of its investigations into her claims. Finally, DSH first discovered Cummings’ video misconduct after Cummings had complained about discrimination; this new, intervening discovery undermines the causal inference. See Curley v. City of N. Las Vegas, 772 F.3d 629, 631 (9th Cir. 2014) (“[N]ew information revealed by [an intervening] investigation defeats any causal inference that might otherwise follow from the temporal proximity between .,. protected activity and .,. termination.”).
3. Cummings’ claim alleging discharge in violation of public policy against DSH also fails because it is premised on the same legal theory and facts as her retaliation claim.
4. Cummings’ claim of intentional interference with prospective economic advantage against Foster fails because Cummings has not shown “actual harm ... as a result of the defendant’s conduct.” Leavitt v. Leisure Sports Incorporation, 103 Nev. 81, 734 P.2d 1221, 1225 (1987). A defendant is only liable to a plaintiff “for the pecuniary harm resulting from loss of the benefits of the [economic] relation,” Restatement (Second) of Torts § 766B (1979). There is ho evidence in the record showing that Cummings’ economic relationship with DSH was severed as a l’esult of Foster’s rumor; rather, DSH fired Cummings be *533 cause of the corrective actions she received in 2012 and the investigation revealing that she had been watching a video during her shift monitoring the telemetry unit.
5. Finally, Cummings’ defamation claim against Foster survives. To establish a defamation claim, a plaintiff must demonstrate (1) a false and defamatory statement of fact by the defendant; (2) an unprivileged publication to a third person; (3) fault, amounting to at least negligence; and (4) actual or presumed damages.[1] Pope v. Motel 6, 121 Nev. 307, 114 P.3d 277, 282 (2005). The main issue on appeal is whether a triable issue of fact exists that Foster was the source of the defamatory statement about Cummings’ threat to “shoot up the place.”
Drawing all inferences in Cummings’ favor, as we must at the summary judgment stage, we hold that there is enough circumstantial evidence from which a reasonable jury could conclude that Foster started the rumor. Diaz v. Eagle Produce Ltd. P’ship, 521 F.3d 1201, 1207 (9th Cir. 2008) (“Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party’s favor.”). First, the DSH security report indicated that the threat was reported by an employee named “Diane” in the telemetry unit. Next, Armstrong testified that on the day of the threat report, Foster and Diane worked together in the telemetry room, according to the shift schedule. Telemetry technicians work in pairs, meaning that the only two employees in the telemetry room that day were Foster and Diane. Finally, as Foster herself acknowledged in deposition testimony, she. and Cummings have had a contentious history, and Foster has previously reported Cummings for several violations of company policy.
We also conclude that Foster is not covered by the intracorporate communication privilege. “[Pjrivileges are defenses to a defamation claim and, therefore, the defendant has the initial burden of properly alleging the privilege and then of proving the allegations at trial.” Lubin v. Kunin, 117 Nev. 107, 17 P.3d 422, 427 (2001) (per curiam). Foster has not met this burden because there is no evidence that she made the statement in good faith. See Circus Circus Hotels, Inc. v. Witherspoon, 99 Nev. 56, 657 P.2d 101, 105 (1983) (per curiam) (“A qualified or conditional privilege exists where a defamatory statement is made in good faith....” (emphasis added)).
This is not to say that all cases involving rumors swirling around the workplace will survive to see a defamation trial. Absent direct evidence, a plaintiff must provide more than mere speculation or suspicion to create a triable issue of fact that one of her co-workers was the source of a defamatory statement. British Airways Bd. v. Boeing Co., 585 F.2d 946, 952 (9th Cir. 1978) (“[A] jury is permitted to draw only those inferences of which the evidence is reasonably susceptible; it may not resort to speculation.”). The evidence here, however, presents a unique situation in which Foster—who harbored the most animus against Cummings and has actively target *534 ed Cummings in the past—was the only-other person in a room with Diane on the day that Diane reported that she heard about Cummings’ threat of violence from fellow employees. On this record, we conclude that a triable issue of fact exists as to whether Foster originated the defamatory statement.
Therefore, we reverse the district court’s grant of summary judgment on the defamation claim against Foster.
AFFIRMED in part, REVERSED in part, and REMANDED. The parties shall bear their own costs on appeal.

 This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

. While a lack of actual damages defeats Cummings’ intentional interference claim, it is not fatal to her defamation claim because damages are presumed where a plaintiff alleges slander per se. Branda v. Sanford, 97 Nev. 643, 637 P.2d 1223, 1225 (1981). Under Nevada law, one category of slander per se includes statements "that the plaintiff committed a crime.” Nev. Indep. Broad. Corp. v. Allen, 99 Nev. 404, 664 P.2d 337, 341 (1983). Here, the alleged defamatory statement—that Cummings had threatened to "shoot up the place”—essentially accuses Cummings of making a criminal threat and, therefore, constitutes slander per se.